FILED
2025 Mar-31  AM 09:56
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | | |
|---|---|---|
| **COLTON PACK,** | ] | |
| | ] | |
| **Plaintiff,** | ] | |
| | ] | |
| **v.** | ] | **Case No.: 4:23-cv-1422-ACA** |
| | ] | |
| **COMISSIONER,** | ] | |
| **SOCIAL SECURITY** | ] | |
| **ADMINISTRATION,** | ] | |
| | ] | |
| **Defendant.** | ] | |

## <u>MEMORANDUM OPINION</u>

Plaintiff Colton Pack appeals the decision of the Commissioner of Social Security finding him not disabled. (Doc. 1). Based on the court's review of the administrative record and the parties' briefs, the court **WILL REVERSE AND REMAND** the Commissioner's decision.

## I.    PROCEDURAL HISTORY

In April 2021, Mr. Pack applied for disability insurance benefits, alleging disability beginning October 31, 2018. (Doc. 9-3 at 12; doc. 9-8 at 5–11). The Commissioner denied Mr. Pack's claim both initially and upon reconsideration (doc. 9-3 at 12; doc. 9-5 at 27–35), and Mr. Pack requested a hearing before an Administrative Law Judge ("ALJ") (doc. 9-6 at 48–49). After holding a hearing (doc. 9-4 at 123–43), the ALJ issued an unfavorable decision (doc. 9-3 at 23). The

Appeals Council denied Mr. Pack's request for review (*id.* at 2–5), making the Commissioner's decision final and ripe for the court's judicial review. *See* 42 U.S.C. § 405(g).

## II.    STANDARD OF REVIEW

The court's role in reviewing claims brought under the Social Security Act is a narrow one. The court "must determine whether the Commissioner's decision is supported by substantial evidence and based on proper legal standards." *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011) (quotation marks omitted). "Under the substantial evidence standard, this court will affirm the ALJ's decision if there exists such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Henry v. Comm'r of Soc. Sec.*, 802 F.3d 1264, 1267 (11th Cir. 2015) (quotation marks omitted). The court may not "decide the facts anew, reweigh the evidence, or substitute [its] judgment for that of the [ALJ]." *Winschel*, 631 F.3d at 1178 (quotation marks omitted). The court must affirm "[e]ven if the evidence preponderates against the Commissioner's findings." *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158–59 (11th Cir. 2004) (quotation marks omitted).

Despite the deferential standard for review of claims, the court must "scrutinize the record as a whole to determine if the decision reached is reasonable and supported by substantial evidence." *Henry*, 802 F.3d at 1267 (quotation marks

omitted). Moreover, the court must reverse the Commissioner's decision if the ALJ does not apply the correct legal standards. *Cornelius v. Sullivan*, 936 F.2d 1143, 1145–46 (11th Cir. 1991).

To determine whether an individual is disabled, an ALJ follows a five-step sequential evaluation process. The ALJ considers:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a residual functional capacity ("RFC") assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's RFC, age, education, and work experience.

*Winschel*, 631 F.3d at 1178.

## III.    EVIDENCE AND ALJ'S DECISION

The court begins by describing the evidence submitted to the ALJ, followed by the ALJ's decision.

Mr. Pack's diagnoses include generalized anxiety disorder, major depressive disorder, insomnia, social phobia, bipolar disorder, and attention deficit hyperactivity disorder ("ADHD"). (Doc. 9-4 at 46, 48, 50; doc. 9-11 at 13; doc. 9-12 at 39–40, 43, 45, 47, 49; doc. 9-13 at 8, 11, 19, 59, 68). From January 2019 to September 2020, Mr. Pack saw Carmelo Mendiola, MD. (*See, e.g.*, doc. 9-11 at 10, 33–35). At intake, Dr. Mendiola said that most history was taken from Mr. Pack's

girlfriend,[1] though some was taken from Mr. Pack. (Doc. 9-11 at 10). Mr. Pack's girlfriend reported that Mr. Pack's panic had recently worsened to the point he could not hold a job. (*Id.*). Dr. Mendiola diagnosed Mr. Pack with major depressive disorder and generalized anxiety disorder. (*Id.*). Although social phobia was not included as a diagnosis, Dr. Mendiola advised Mr. Pack that he had "some sort of a social phobia with depression and anxiety neurosis." (*Id.* at 11). Dr. Mendiola started Mr. Pack on two medications. (Doc. 9-11 at 11). Over the course of Mr. Pack's treatment by Dr. Mendiola, Mr. Pack reported several side effects from his medications, including dizziness (*id.* at 12), sexual dysfunction and other "minor side effects" (doc. 9-12 at 43–44), and feeling "hungover" (doc. 9-11 at 33). This resulted in several changes in medications. (*See e.g.*, doc. 9-11 at 33; doc. 9-12 at 44).

In late 2020, Dr. Mendiola referred Mr. Pack to Robin Pack, CRNP. (*See, e.g.*, doc. 9-12 at 30). At intake, Mr. Pack and his girlfriend described his anxiety and depression, stating that no medications had worked in the past. (*Id.*).  Mr. Pack complained of many anxiety symptoms, including physical symptoms that had worsened over the past few months. (*Id.*). In November 2020, Mr. Pack reported that

---

[1] Many documents refer to Mr. Pack's significant other as his girlfriend, wife, and fiancée. (*See, e.g.*, doc. 9-11 at 10 ("wife"); doc. 9-12 at 16 ("fianc[é]e"); doc. 9-4 at 133 ("girlfriend")). Because Mr. Pack refers to her in his hearing testimony as his girlfriend, the court will refer to her as his girlfriend throughout this opinion. (*See* doc. 9-4 at 133).

he was out of one of his medications but did not ask for refills because he did not think it was helping. (Doc. 9-12 at 26). Mr. Pack reported experiencing physical symptoms of anxiety on a daily basis, including racing heart, sweaty palms, and chest heaviness. (*Id.*). In January 2021, Mr. Pack reported that after starting two new medications, he experienced an increase in racing thoughts and sleep disturbances. (Doc. 9-12 at 23). During his course of treatment with Nurse Pack, Mr. Pack was able to verbalize understanding to his treatment plan (*id.* at 21–22, 27), and by May 2021, his symptoms seemed to improve (*id.* at 16).

In August 2021, Mr. Pack was examined by Dorn R. Majure, PsyD via Telehealth. (Doc. 9-13 at 2). Mr. Pack told Dr. Majure that he could not shop due to anxiety, but that he could help minimally with cleaning, cooking, and yard work and managed his own finances. (*Id.* at 3–4). Mr. Pack reported feeling depressed and anxious with panic symptoms including racing heart, cold sweat, and nausea. (*Id.*). Dr. Majure found that Mr. Pack was appropriately dressed and groomed; had intact recent and remote memory; was oriented to person, place, time, and situation; exhibited constricted affect; had average intellectual functioning; and was "mildly to perhaps moderately impaired in the ability to understand, to carry out and to remember instructions, and to respond appropriately to supervision, coworkers, and work pressures in a work setting." (*Id.*). Dr. Majure opined that Mr. Pack would not

require assistance with awarded funds, and his prognosis was "guarded to fair." (Doc. 9-13 at 5).

By late 2022, Mr. Pack reported to Nurse Pack that he had stopped taking his medications because he did not think they were working. (Doc. 9-13 at 64–65). Nurse Pack encouraged him to discuss worsening symptoms with her before quitting because some of the medications had improved his symptoms. (*Id.*). He consistently reported side effects for most medications (*id.* at 59), still felt highly anxious (*id.* at 61), rarely left the house (doc. 9-13 at 61), and had irrational fears (*id.*).

From August 2022 through June 2023, Mr. Pack saw Lynna Meadows, PhD, LPC. (*See e.g.*, doc. 9-4 at 6, 10). Dr. Meadows diagnosed Mr. Pack with acute stress disorder, generalized anxiety disorder, social anxiety disorder, and major depressive disorder. (Doc. 9-13 at 45). Her treatment notes indicate that Mr. Pack reported depressed mood, sleep disturbance, decreased energy, poor concentration, anxiety, obsessions and compulsions, fears, withdrawal, and family conflict, and that those symptoms had been present for over one year. (*Id.* at 50). Dr. Meadows rated his levels of impairment in "work/school performance" and "social" areas as "profound," and his levels of impairment in "marriage/family" and "activities of daily living" as "severe." (*Id.*). Dr. Meadows found that Mr. Pack was not able to engage in substantial gainful activity because of "thought processing issues and

racing thoughts," social anxiety, and depression, which "causes him to spend a great deal of time in bed and almost always confined to his home." (*Id.* at 45).

The ALJ determined that Mr. Pack had not engaged in substantial gainful activity since February 26, 2020, the date of a prior final decision upheld by the Appeals Council finding Mr. Pack not disabled. (Doc. 9-3 at 12, 14). The ALJ found that Mr. Pack's anxiety disorder, depression disorder, psychophysiologic insomnia, social phobia, bipolar disorder, and ADHD were severe impairments. (Doc. 9-3 at 14). The ALJ then concluded that Mr. Pack does not suffer from an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1. (*Id.* at 15–17).

After considering the evidence in the record, the ALJ determined that Mr. Pack "has the residual functional capacity to perform a full range of work at all exertional levels but with" several "nonexertional limitations," such as carrying out only "simple instructions" and work-related decisions; "maintain[ing] attention and concentration for [two]-hour periods at a time"; no "interaction with the general public"; "occasional interaction with coworkers"; no "specific production requirement"; and "routine and infrequent workplace changes." (Doc. 9-3 at 17). Based on this residual functional capacity and the testimony of a vocational expert, the ALJ found that Mr. Pack was unable to perform any past relevant work (*id.* at 21), but that he was capable of performing jobs that exist in significant numbers in

the national economy such as dishwasher, hand packer, and laundry worker (*id.* at 22). Accordingly, the ALJ determined that Mr. Pack had not been under a disability, as defined in the Social Security Act, from February 26, 2020, the date of the prior, upheld final decision (*Id.* at 23).

## IV.    DISCUSSION

Mr. Pack argues that the court should reverse and remand the Commissioner's decision on the grounds that: (1) the ALJ applied impermissible "sit and squirm jurisprudence"; (2) the ALJ failed to develop the record by not considering the GeneSight records or requesting Dr. Meadows's treatment notes; (3) the Appeals Council erred by denying review in the face of new, material evidence; (4) the ALJ failed to consider the side effects of Mr. Pack's medications; and (5) the ALJ's decision is not supported by substantial evidence in the record. (Doc. 15 at 19–36).

The court will address each of these arguments in the order presented above.

### 1.    The ALJ Did Not Apply "Sit and Squirm Jurisprudence"

Mr. Pack contends that the ALJ committed legal error when she found only a moderate limitation in Mr. Pack's ability to interact in others, due, "in part," to Mr. Pack's "appropriate interact[ion]" with the ALJ and his representative at the hearing. (*Id.* at 19). Similarly, Mr. Pack argues that the ALJ committed legal error when she found only a moderate limitation in his ability to concentrate, persist, and maintain pace, due, "in part," to his ability to appropriately respond to the ALJ's

questions at the hearing. (*Id.*). According to Mr. Pack, the ALJ's incorporation of her observations of Mr. Pack at the hearing into her decision is impermissible "sit and squirm jurisprudence." (*Id.*).

An ALJ engages in "sit and squirm jurisprudence" when she "subjectively arrive[s] at an index of traits which [s]he expects the claimant to manifest at the hearing" based on the claimant's alleged disabilities. *Wilson v. Heckler*, 734 F.2d 513, 517 (11th Cir. 1984) (citing *Freeman v. Schweiker*, 681 F.2d 727, 731 (11th Cir. 1982)). Then, "[i]f the claimant falls short of the index, the claim is denied." *Wilson*, 734 F.3d at 517 (citing *Freeman*, 681 F.2d at 731). This practice is impermissible because it is likely to produce unreliable conclusions by ALJs and adverse incentives in claimants. *Wilson*, 734 F.3d at 517 (citing *Freeman*, 681 F.2d at 731).

But an ALJ does not engage in "sit and squirm jurisprudence"—even if she incorporates her observations of the claimant into her decision—so long as she "properly considered a variety of factors." *See Harwell v. Heckler*, 735 F.2d 1292, 1293 (11th Cir. 1984). Here, the ALJ's findings of moderate limitations in abilities to interact with others and concentrate, persist, and maintain pace did not rely solely on her observations of Mr. Pack at the hearing. (Doc. 9-3 at 16). Instead, she also relied on Mr. Pack's self-reported ability to spend time with his family, ability to interact with authority figures, and difficulty concentrating; opinions from his

treating provider and consultative examiner; and mental status examinations in the treatment notes. (*Id.*).

Accordingly, the court finds that the ALJ did not impermissibly engage in "sit and squirm jurisprudence." *See Harwell*, 735 F.2d at 1293.

2.    The ALJ Did Not Owe a Heightened Duty to Develop the Record and Did Not Fail to Develop the Record Under Her Basic Duty

Mr. Pack next argues that the ALJ had a heightened duty to develop the record because Mr. Pack was represented by a non-attorney, and that the ALJ failed to carry out that duty by not considering the GeneSight results or requesting missing treatment notes from Dr. Meadows. (Doc. 15 at 20–26).

The Eleventh Circuit has never upheld a heightened standard for claimants represented by non-attorneys, which Mr. Pack concedes. *Cf. Brown v. Shalala*, 44 F.3d 931, 934–35 (11th Cir. 1995) (requiring a heightened duty to develop the record when the claimant was unrepresented at the hearing and failed to validly waive his right to representation); *Cowart v. Schweiker*, 662 F.2d 731, 735 (11th Cir. 1981) (same); *see* doc. 22 at 2.[2] Rather, the Eleventh Circuit has maintained that,

---

[2] Mr. Pack also argues "that the representation he received was significantly below that which an attorney would provide" because an attorney representative would have asked questions of the vocational expert, and his representative did not. (Doc. 22 at 2; *see also* doc. 15 at 23). But both attorney and non-attorney representatives may represent claimants. *See* 20 C.F.R. § 404.1705(b). Moreover, "to the extent [Mr. Pack] maintains that his representative's status as a non-attorney imposed upon the ALJ a heightened duty to fully develop the record, [Mr. Pack] is not entitled to relief because he does not challenge the qualifications of his representative." *Ellison v. Barnhart*, 355 F.3d 1272, 1276 (11th Cir. 2003).

notwithstanding the claimant's representation, ALJs have a basic obligation to develop a full and fair record. *Ellison v. Barnhart*, 355 F.3d 1272, 1276 (11th Cir. 2003). This basic duty is limited to the twelve-month period preceding the month in which the claimant filed his application, or if applicable, an earlier twelve-month period. *Id.*; *see* 20 C.F.R. § 404.1512(b)(1).

Mr. Pack filed his application for disability and disability insurance benefits on April 26, 2021. (*See* doc. 9-3 at 12; doc. 9-8 at 2, 5). Therefore, "the ALJ was bound to develop Mr. [Pack's] medical history for the [twelve] months prior to" April 2021, at the very latest, if not an earlier twelve-month period. *Ellison*, 355 F.3d at 1276; *see* 20 C.F.R. § 404.1512(b)(1). But Mr. Pack's GeneSight test was not ordered by his treating provider until September 13, 2022 (doc. 9-13 at 59), and it was not reported until September 19, 2022 (doc. 9-4 at 110). Thus, the records were not available until over one year after the ALJ's duty to develop the record closed. Similarly, Mr. Pack did not begin seeing Dr. Meadows until August 5, 2022, so all of Dr. Meadows's treatment notes were written over one year after the ALJ's duty to develop the record closed. (Doc. 9-13 at 45). Under her basic duty, the ALJ was not required to develop either the GeneSight results or Dr. Meadows's treatment notes. *See Ellison*, 355 F.3d at 1276; *see* 20 C.F.R. § 404.1512(b)(1).

Accordingly, the court finds that the ALJ neither owed a heightened duty to develop the record nor failed to carry out her basic duty to develop the record by not developing the GeneSight results or Dr. Meadows's treatment notes.

### 3. The Appeals Council Did Not Err by Denying Review

Mr. Pack asserts that the Appeals Council erred by denying review of the ALJ's decision despite receiving additional evidence, including the GeneSight results and the second opinion from Dr. Meadows. (Doc. 15 at 26–28). "Generally, a claimant may present evidence at each stage of the administrative process." *Hargress v. Soc. Sec. Admin., Comm'r*, 883 F.3d 1302, 1308 (11th Cir. 2018). The Appeals Council must review a case if the claimant submits "additional evidence that is new, material, and relates to the period on or before the date of the hearing decision, and there is a reasonable probability that the additional evidence would change the outcome of the decision." 20 C.F.R. § 404.970(a)(5). Here, the Appeals Council refused to consider the GeneSight results and the second opinion from Dr. Meadows because it found that they did not show a reasonable probability of changing the outcome of the ALJ's decision.[3] (Doc. 9-3 at 3).

---

[3] The Appeals Council also refused to review the second opinion from Dr. Meadows because it was not chronologically relevant. (Doc. 9-3 at 3). Because the court agrees that the GeneSight results and the second opinion from Dr. Meadows are not material, the court need not consider whether they were chronologically relevant.

The court reviews *de novo* whether supplemental evidence is new, material, and chronologically relevant. *Washington v. Soc. Sec. Admin., Comm'r*, 806 F.3d 1317, 1320 (11th Cir. 2015). The court will begin with materiality, which is whether there is a reasonable probability that the evidence would change the administrative result. *Id.* at 1321.

The court agrees with the Appeals Council's assessment that the evidence does not offer a reasonable probability of changing the outcome of the ALJ's decision. As for the GeneSight results, the results themselves provide a disclaimer that the results are not, and ought not be, determinative of provider decisions. (*See* doc. 9-4 at 110 ("Medications should not be changed based solely on the [GeneSight] test results."). Moreover, Mr. Pack explains that the GeneSight results "support [his] regular reports in the treatment notes about the ineffectiveness of his medication and that they often [caused] side effects." (Doc. 15 at 24). Because Mr. Pack admits that the GeneSight results are redundant of information already included in the record, and because the results themselves caution against providers' reliance, the GeneSight results do not demonstrate a reasonable probability of changing the outcome of the ALJ's decision in light of other dispositive evidence in the record. *Washington*, 806 F.3d at 1320.

As for Dr. Meadows's second opinion, the court finds that neither the March 2023 letter nor the January 2023 questionnaire have a reasonable probability of

changing the outcome of the ALJ's decision. The information contained in Dr. Meadows's March 2023 letter is not materially different from that in her October 2022 letter, which the ALJ considered in her decision. (*Compare* doc. 9-4 at 6, *with id.* at 11 (nearly identical letters except for one additional sentence about Mr. Pack's "tightness of chest, light headedness, and severe sleep issues"); *see* doc. 9-3 at 19). And the information contained in Dr. Meadows's January 2023 questionnaire is not materially different from that in her November 2022 questionnaire, which the ALJ also considered in her decision. (*Compare* doc. 9-4 at 2–4, *with* doc. 9-13 at 47–49 (nearly identical questionnaires except for changes to three scale questions and an additional sentence about sleep disturbance); *see* doc. 9-3 at 19–21). Because records of sleep disturbance, chest tightness and pain, and dizziness were already before the ALJ (*see, e.g.*, doc. 9-4 at 47 (inability to sleep); doc. 9-12 at 26 (chest heaviness); doc. 9-12 at 38 (dizziness)), Dr. Meadows's second opinion is not material.

Accordingly, the court finds that the Appeals Council did not err by refusing to review Mr. Pack's case on the basis of the GeneSight results and second opinion from Dr. Meadows.

### 4.    The ALJ Erred by Failing to Consider Medications' Side Effects

Mr. Pack asserts that because the ALJ failed to consider the effectiveness and side effects of his medications, as required by 20 C.F.R. § 404.1529(c)(3)(iv), the court must reverse and remand the ALJ's decision. *See* 20 C.F.R.

§ 404.1529(c)(3)(iv) (The Social Security Administration "will consider . . . [t]he type, dosage, effectiveness, and side effects of any medication [the claimant] take[s].")." [T]he ALJ is required to consider the effectiveness and side effects of treatments or medication in crafting a claimant's [residual functional capacity]." *Malak v. Comm'r of Soc. Sec.*, __ F.4th __, 2025 WL 837927, at *15 (11th Cir. Mar. 18, 2025).

Mr. Pack's record contains several reports of side effects. (*See* doc. 9-4 at 131 (Mr. Pack's testimony that his medications cause "a lot of side effects"); doc. 9-4 at 49 (Cymbalta and Mirtazapine causing unidentified side effects); doc. 9-9 at 47, 64 (unidentified medications making anxiety worse; Carbamazepine causing full body rash); doc. 9-11 at 12 (Buspirone and Mirtazapine causing dizziness); doc. 9-13 at 58 (unidentified medications causing dizziness and poor sleep); doc. 9-13 at 62 (sexual dysfunction)). Despite this, the ALJ did not consider Mr. Pack's side effects or the effectiveness of his medications in her discussion of Mr. Pack's residual functional capacity. (*See* doc. 9-3 at 17–21).

Accordingly, the ALJ's failure to consider Mr. Pack's side effects in her decision was error. *See Malak*, __ F.4th __, 2025 WL 837927, at *15. The court **WILL REVERSE AND REMAND** on this ground, instructing the ALJ to consider evidence regarding side effects and the effectiveness of Mr. Pack's medication on remand.

<u>**5.**</u>    <u>**Substantial Evidence Supports the ALJ's Determination of Step Three**</u>

Mr. Pack argues that substantial evidence does not support the ALJ's decision because: (1) a limitation on Mr. Pack's interaction with supervisors was excluded from questions to the vocational expert; (2) Dr. Majure's opinion is inconsistent and unsupported by the record; (3) the record contradicts the ALJ's finding that Mr. Pack could adapt and manage himself; (4) the ALJ failed to address Colton's extreme social phobia; and (5) the record and additional evidence presented to the Appeals Council contradict the ALJ's finding that Mr. Pack's condition was controlled by medication. (Doc. 15 at 30–36). The court addresses each argument below.

*i.    Limitation on Interaction with Supervisors*

Mr. Pack contends that substantial evidence does not support the ALJ's decision because the ALJ neither asked the vocational expert about Mr. Pack's limitation on interaction with supervisors, nor included that limitation in her residual functional capacity determination, despite Dr. Majure's finding that Mr. Pack had a mild to moderate limitation on interaction with supervisors. (Doc. 15 at 30–31). The court disagrees.

"In order for a vocational expert's testimony to constitute substantial evidence, the ALJ must pose a hypothetical question which comprises all of the claimant's impairments." *Wilson v. Barnhart*, 284 F.3d 1219, 1227 (11th Cir. 2002). But the ALJ is "not required to include findings in the hypothetical that the ALJ

ha[s] properly rejected as unsupported." *Crawford*, 363 F.3d at 1161; *see also McSwain v. Bowen*, 814 F.2d 617, 619–20 & n.1 (11th Cir. 1987) (holding that the ALJ did not err in asking a hypothetical question that assumed the only restrictions that the evidence supported and omitted other restrictions).

In her decision, the ALJ properly explained why she did not adopt Dr. Majure's opinion that Mr. Pack had a limitation in ability to interact with supervisors. (Doc. 9-3 at 15–16) (pointing to Mr. Pack's own report that he could get along with authority figures long enough to have a conversation). Because the ALJ's hypothetical was not required to include limitations she thought were unsupported, the ALJ did not err in omitting that limitation. *Crawford*, 363 F.3d at 1161.

ii.     *Inconsistencies in Dr. Majure's Opinion*

Mr. Pack objects to the ALJ's finding that Dr. Majure's medical opinion was "consistent" with the record and "supported" as required by 20 C.F.R. § 404.1520(c). (Doc. 15 at 31–32). An ALJ considers the persuasiveness of a medical opinion using the following five factors: (1) supportability; (2) consistency; (3) the relationship with the claimant, including the length of the treatment relationship, the frequency of examinations, and the purpose and extent of the treatment relationship; (4) specialization; and (5) other factors, including evidence showing the medical source has familiarity with other evidence or an understanding

17

of the Social Security Administration's policies and evidentiary requirements. *Id.* § 404.1520c(c). Supportability and consistency are the most important factors, and therefore, the ALJ must explain how he considered those factors. *Id.* § 404.1520c(b)(2). Supportability refers to the extent to which an examiner relies on "objective medical evidence" and "supporting explanations," and consistency refers to the opinion's similarity to "the evidence from other medical sources and nonmedical sources in the claim." *Id.* § 404.1520c(c)(1)–(2).

Here, the ALJ found Dr. Majure's "opinion persuasive because it [wa]s supported by [Dr. Majure's] own mental status examination" and consistent with "multiple mental status examinations during treatment." (Doc. 9-3 at 20). But the ALJ noted that its persuasiveness was limited because Dr. Majure "did not provide specific function-by-function limitations," so the ALJ "considered the entire evidence of record in constructing the claimant's residual functional capacity." (*Id.*).

Mr. Pack argues that the ALJ should not have found Dr. Majure's opinion persuasive because of the following errors: a typo in the exhibit list appended to the ALJ's decision; Dr. Majure's opinion on Mr. Pack's choice of dress despite conducting the examination via "telephone";[4] a "brief" cognitive exam; Dr. Majure's incorrect statement that Mr. Pack was in regular education classes; and Dr. Majure's

---

[4] Mr. Pack contends that the appointment was by telephone, but the record indicates that the appointment was by "Telehealth," which may have included video. (Doc. 9-13 at 2).

estimation of Mr. Pack's "average" functioning. (Doc. 15 at 31). But Mr. Pack does not argue that the ALJ failed to consider supportability and consistency as the regulation requires. (*Id.*). This court will not "reweigh the evidence[] or substitute [its] judgment for that of the" Commissioner. *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).

To the extent Mr. Pack argues that the persuasiveness finding is not supported by substantial evidence, the court disagrees. Dr. Majure's opinion—which found that Mr. Pack had average intellectual functioning and was "mildly to perhaps moderately impaired in the abilit[ies] to understand" and "carry out and to remember instructions" (doc. 9-13 at 3–4)—is similar to other treating providers' findings that Mr. Pack had "intact" thought process (*see, e.g.*, doc. 9-13 at 8, 10, 16, 18), "fair" and "fair-poor" insight (*see, e.g.*, *id.* at 8, 10, 16, 19), and "fair" judgment (*see, e.g.*, *id.*). The court declines to find that the ALJ erred in evaluating the persuasiveness of Dr. Majure's opinion.

   iii.   *The ALJ's Finding that Mr. Pack Could Adapt and Manage Himself*

Mr. Pack next asserts that substantial evidence does not support the ALJ's finding of a moderate limitation in Mr. Pack's ability to adapt and manage himself because Mr. Pack "routinely failed to follow his medical providers' instructions," citing to at least ten instances of medication noncompliance. (Doc. 15 at 32).

In finding a moderate limitation in adaptation and self-management, the ALJ summarized Mr. Pack's function report as an "acknowledge[ment]" that Mr. Pack was "able to take care of his son, pick up trash throughout the house, shop by phone and computer, watch television and play video games, and regularly attend doctor's appointments." (Doc. 9-3 at 16) (citing doc. 9-9). But the ALJ's summary of Mr. Pack's function report is inaccurate. Mr. Pack reported that he "pour[s] [his son] milk or juice"; needs his medication "handed to [him] with a drink and then maybe a few reminders"; "picks up trash through[out] the house sometimes," only "once or twice a week" when "asked and reminded"; shops by phone or computer a "couple [of] times a week" for ten minutes before he "get[s] tired and never buy[s] any of it." (Doc. 9-9 at 58–60). And although Mr. Pack reported that he was interested in playing video games, he did not report actually playing them. (*Id.* at 61). Therefore, the function report hardly "acknowledge[s]" the abilities the ALJ concluded it did.

After summarizing the function report, the ALJ also found that Mr. Pack could "handle his own medical care and medication regimen, . . . take care of his son, . . . take care of his personal needs[,] and shop by phone and online." (Doc. 9-3 at 16). In support of this finding, she referenced her earlier finding that "[d]uring treatment, [Mr. Pack] verbalized understanding of diagnoses, treatment plans, risks, benefits, procedures, patient instructions, and medication management." (*Id.* at 15).

20

But Mr. Pack's ability to *understand* his treating provider's words is separate and apart from his ability to *follow* them. Indeed, the record does not support Mr. Pack's ability to follow his treating providers' instructions. (*See, e.g.*, doc. 9-12 at 20 (Mr. Pack "reported feeling excessively restless with the Abilify so he stopped taking it."); *id.* at 23 (Mr. Pack "stopped taking both" Abilify and Wellbutrin after experiencing increased restlessness.); *id.* at 26 (Mr. Pack "ran out of Viibryd and did not call for refills" because "he didn't notice any help from it."); doc. 9-13 at 64–65 (Mr. Pack stopped "taking previously prescribed medications, stating he couldn't tell a difference," so Nurse Pack discussed with him "about importance of notifying provider of worsening symptoms . . . and not to stop medications [without] discussion.")). And even though Mr. Pack acknowledged going to doctor's appointments once a month and taking his medications, he was only able to complete these activities with reminders. (Doc. 9-9 at 59, 61).

The remaining evidence the ALJ cites in this section casts further doubt on her determination that Mr. Pack could "take care of his personal needs." (Doc. 9-3 at 16; *but see id.* (discussing Mr. Pack's reported "issues dressing, bathing, caring for his hair, and shaving," as well as his treating provider's notes that he "ha[s] no useful ability to . . . respond appropriately to changes in a routine work setting")). Thus, the evidence the ALJ cites does not support the ALJ's finding that Mr. Pack has a moderate limitation in the ability to adapt and manage himself because "he can

handle his own medical care and medication regimen, he can take care of his son, and he can take care of his personal needs and shop by phone and online." (Doc. 9-3 at 16).

Accordingly, the court **WILL REVERSE AND REMAND** on the ground that substantial evidence does not support the ALJ's determination of Mr. Pack's ability to adapt and manage himself.

### iv.    *Mr. Pack's Social Phobia*

Mr. Pack also argues that the ALJ's decision is not supported by substantial evidence because she failed to address Mr. Pack's "extreme social phobia in any meaningful way." (Doc. 15 at 34). But the ALJ included social phobia as one of Mr. Pack's severe impairments (doc. 9-3 at 14), and she discussed his reported anxiety in social settings, including a limitation "to jobs that do not require interaction with the general public" (*id.* at 16; *see also id.* at 17 (including that limitation in Mr. Pack's residual functional capacity determination); *see also* doc. 9-4 at 140 (including that limitation in the ALJ's questions to the vocational expert)). Thus, the court finds that the ALJ did address Mr. Pack's social phobia in a meaningful way and will not remand on this ground.

### v.    *The ALJ's Finding that Mr. Pack's Condition was Controlled by Medication*

Finally, Mr. Pack contends that the ALJ's finding that Mr. Pack's condition was controlled by medication was not supported by the additional evidence

presented to the Appeals Council. (Doc. 15 at 35). Because the court finds that the Appeals Council did not err in refusing to consider Mr. Pack's additional evidence, as discussed above, the court need not consider the application of that evidence to the ALJ's decision.

## V.    CONCLUSION

The court **WILL REVERSE AND REMAND** the Commissioner's final decision. The court will enter a separate order consistent with this memorandum opinion.

**DONE** and **ORDERED** this March 31, 2025.

_____
**ANNEMARIE CARNEY AXON**
UNITED STATES DISTRICT JUDGE